# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAKEIYA WRIGHT      :

         **Plaintiff**      :

   **v.**      :

TERRY CACCIUTTI, et al.,      :      **3:12-CV-1682**

     :      **(JUDGE MARIANI)**

         **Defendants**      :

   **v.**      :

KURT CARTER      :

         **Additional Defendant**      :

## MEMORANDUM OPINION

### I. Introduction

Presently before the Court is a motion for summary judgment filed by Defendants John and Terry Cacciutti (Doc. 56). Plaintiff, Takeiya Wright, filed this action to recover damages as a result of an alleged slip and fall on snow and ice at a property owned by the Cacciuttis (Pl. First Am. Comp., Doc. 30, at ¶¶ 2, 10). Defendant SCI Janitorial Services, Inc. and Additional Defendant Kurt Carter have also filed motions for summary judgment. The Court will address those motions in separate opinions.

For the reasons set forth below, the Court will deny Defendants Cacciuttis' Motion for Summary Judgment due to numerous genuine issues of material fact which must be resolved at trial.

## II. Statement of Undisputed Facts

From January 27 through January 30, 2011, Plaintiff, Takeiya Wright, and a group of friends stayed at a ski chalet owned by Defendants Cacciutti in Lackawaxen, Pennsylvania (Defs.' Statement of Mat. Facts in Supp. of Mot. For Summ. J., Doc. 58, at ¶¶ 1, 6, 63). Kurt Carter, a member of Plaintiff's party, had previously executed an agreement to rent the property for this period of time (Doc. 58, at ¶ 40).[1] While it was snowing moderately upon Wright's arrival on January 27 and there was snow on the ground, she had no difficulties walking from the car to the house (*Id.* at ¶¶ 8-9, 12).

During Plaintiff's trip, it snowed intermittently, if not consistently (Doc. 58, at ¶ 42; Pl.'s Answer/Opp. to Defs.' Statement of Mat. Facts in Supp. Of Mot. For Summ. J., Doc. 67, at ¶ 42). There was a shovel and approximately half a bag of calcium chloride on the property and Carter used both of these during the party's stay (Doc. 58, at ¶¶ 44, 45). Although he shoveled the landing, he did not shovel or salt the driveway area (*Id.* at ¶¶ 46, 47). Throughout the trip, Plaintiff's party left through the back of the house to go skiing and she had no reason to exit through the front door (*Id.* at ¶¶ 14, 16). At no point did anyone call management regarding any problems or concerns about the driveway or the outside of the house (*Id.* at ¶¶ 15, 29, 50).

On January 30, 2011, Plaintiff exited the home and walked onto the walkway/driveway for the first time since her arrival (*Id.* at ¶¶ 17, 19). She walked to the

---

[1] While none of the parties has produced the executed lease agreement and there is a dispute as to the contents of the signed agreement, all parties agree that Carter signed some form of a rental agreement.

passenger side of Aneisha Ford's car and placed her bag and phone in the front seat (*Id.* at ¶ 21). She subsequently placed her suitcase in the trunk and then walked around the other side of the car to say good bye to people who were leaving (*Id.* at ¶¶ 22, 23). After doing so, Plaintiff heard her phone ring and walked around the front of the car to retrieve it from the passenger seat (*Id.* at ¶¶ 24, 25). She spoke on her phone for five minutes before exiting the car with the intention of going back into the house to make sure everything was cleaned up (*Id.* at ¶¶ 26, 27). At this point, approximately 10:30 a.m., Plaintiff alleges that she slipped and fell on snow and ice located on the driveway of the property (Doc. 30, at ¶ 10; Doc. 58, at ¶ 17).

In describing the circumstances surrounding her fall, Plaintiff stated during her deposition:

> Q. Okay. At some point, did you figure out what it is that caused to you fall (sic)?
>
> A. I mean, my – I would think that it was something because it was snow on the ground. And then as I was walking it was ice underneath there.
>
> Q. Did you actually see the ice?
>
> A. I mean, there was snow on top of the ground.
>
> Q. Did you actually see the ice at some point?
>
> A. Not visible to my eye.

(Dep. of Takeiya Wright, at 58). It was snowing at the time of her fall and there was snow on the car, although it is unclear how much (Doc. 58, at ¶¶ 18, 32; Doc. 67, at ¶ 18).

Plaintiff admits that prior to the fall, she was not concerned about the walkway or driveway that day and that nobody else complained about slippery conditions outside the home (Doc. 58, at ¶¶ 29, 31). John Cacciutti stated that he received no notifications about anyone else slipping, falling, or being injured on his property (*Id.* at ¶ 67). Several days later, Defendants Warren and Pat Toder,[2] owners of Defendant SCI Janitorial Services, examined the driveway but failed to see any icy conditions (*Id.* at ¶¶ 54, 69; Dep. of John Cacciutti, at 70). Plaintiff asserts that as a result of this fall, she suffered a bi-mal fracture of her ankle and now has ongoing pain, discomfort, and walks with a limp (Pl.'s Brief in Opp. of Def. John and Terry Cacciutti's Mot. For Summ. J., Doc. 72, at 3).

SCI Janitorial Services provided services for the ski chalet during the time in question (Doc. 58, at ¶ 55; Doc. 67, at ¶ 55). While the extent of these services is at issue, the parties agree that SCI used Paul Benesz, a local resident, as a snow plow person (Doc. 58, at ¶¶ 56, 65). There were no contracts with Benesz, but Warren Toder would call Benesz as necessary and tell him to come plow (*Id.* at ¶¶ 60, 62). It is unclear if Benesz would also plow as he felt was necessary in the absence of a call from Toder. However, Benesz was not responsible for salting and Toder would find someone else to do this as necessary (*Id.* at ¶ 61).

Plaintiff filed a Complaint in this matter on May 17, 2012 and subsequently an Amended Complaint on May 31, 2012, and First Amended Complaint on December 3, 2012

---

[2] Warren and Pat Toder are named as defendants in Plaintiff's First Amended Complaint (Doc. 30). SCI Janitorial claims that the parties have agreed to dismiss the Toders from the case (Def. SCI Janitorial Services, Inc. Mot. for Summ. J., Doc. 68, fn. 1). However, in the absence of a stipulation at this time, the Court must assume that the Toders remain defendants in this matter.

(Docs. 1, 3, 30). Plaintiff alleges Negligence (Count III), Negligence – Vicarious Liability (Count IV), and Breach of Contract (Count V) (*Id.*).[3] The Cacciuttis now move for summary judgment.

## III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to

---

[3] Plaintiff did not include a Count I or II.

5

the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## IV. Statement of Disputed Facts

In accordance with the summary judgment standards explained in Section III, *supra,* it is clear that many genuine disputes of material fact exist in this case that cannot be resolved on summary judgment. Because this is Defendants Cacciuttis' motion for summary judgment, the Court must draw all reasonable inferences in favor of Wright.

In summary, the material facts that remain in dispute are as follows:

1. *Whether there was ice on the ground at the time Plaintiff slipped and whether this ice was the cause of her fall.*

It is uncontested that the driveway had snow on it at the time of Plaintiff's fall. Nonetheless, Defendants point to Plaintiff's testimony, wherein she admits to not specifically seeing the ice, as evidence that ice was not the cause of her fall and/or that ice was not present at this location. Furthermore, the Toders claimed they did not see ice when they examined the area of the alleged slip and fall several days later. However, Carter testified that it was slippery when he walked outside on January 30 and that he warned others to be careful (Dep. of Kurt Carter, at 38-39, 68-69).

Additionally, the Plaintiff's liability expert report states that:

6

On the days prior to this incident, there was a cold and snowy period in the Lackawaxen area, with a winter storm leaving about 12" of snow on January 26th into the 27th. The period from the 27th through the 30th was cold with occasional light snow following the larger storm. The temperatures on the day of the incident were between 19 and 26 degrees and it was approximately 27 degrees at 10:30 AM . . . .

(Doc. 72-1, at 8). Given the testimony and weather conditions, a jury could reasonably find that ice was present and that this ice was a factual cause of Plaintiff's fall. Therefore, there is a genuine dispute regarding both the presence of ice and whether it was the factual cause of Plaintiff's fall.

2. *Whether the conditions were generally slippery and, if so, whether the snow was allowed to unreasonably accumulate without removal for an unreasonable amount of time.*

The Cacciuttis argue that Plaintiff's negligence and vicarious liability claims against them should be dismissed based upon the doctrine of hills and ridges (Doc. 57, at 6). To recover under the hills and ridges doctrine, a plaintiff must demonstrate:

> (1) that snow and ice had accumulated on the sidewalk in ridges or elevations of such size and character as to unreasonably obstruct travel and constitute a danger to pedestrians traveling thereon; (2) that the property owner had notice, either actual or constructive, of the existence of such condition; (3) that it was the dangerous accumulation of snow and ice which caused the plaintiff to fall.

*Rinaldi v. Levine*, 176 A.2d 623, 625-626 (Pa. 1962). Additionally, for liability to attach, the dangerous conditions must be allowed to remain for an unreasonable length of time. *Id.* at 625. This doctrine does not apply where the ice is localized and there are not general

7

slippery conditions in the community. *Williams v. U.S.*, 507 F. Supp. 121, 123 (E.D. Pa. 1981) (citing *Bacsick v. Barnes*, 341 A.2d 157, 160 (Pa. Super. 1975)).

Here, while there is no disagreement that it had been snowing over the past three days, and that there was snow on the ground, the plaintiff argues that the ice was isolated and therefore the hills and ridges doctrine is inapplicable (Doc. 72, at 10-13). As such, they point to the undisputed facts that she was able to walk to the car, and subsequently around the car to place her luggage in the trunk, as well as walking to say good-bye to her friends and then back to the car to answer her phone (*Id.* at 11-12). Furthermore, there were no other reports of anyone falling and no one else complained about slippery conditions (*Id.*). While Defendants do not specifically argue that the conditions were generally slippery, given their invocation of the doctrine, the Court assumes they take such a position and finds that the amount of snow fall over the three days, in conjunction with the below freezing temperatures, raise a question of fact as to whether the ice was limited to the area where Plaintiff fell.

In turn, Defendants contend that "Plaintiffs have not produced any evidence concerning the nature, amount, or characteristics of the purported condition of snow and ice other than the plaintiff's own testimony that there was snow on the ground" (Doc. 57, at 7). However, Plaintiff has produced expert testimony that approximately 12 inches of snow had fallen the day that Wright's party arrived at the property and that it continued snowing over the next three days (Doc. 72-1, at 8). Both Wright and Carter similarly testified to the

8

continuing snowfall for the duration of the trip (Doc. 58, at ¶ 42; Doc. 67, at ¶ 42). Wright also provided several photographs taken on January 28, 2011, depicting the accumulation of snow around the property. During the three days, Carter stated that he did not recall anyone plowing or salting the area, although he does not discount the possibility that someone may have (Dep. of Kurt Carter, at 53-54, 66). Therefore, Defendants have failed to establish the absence of a genuine issue of material fact as to the amount of snow accumulation or the period of time over which it may have accumulated and remained on the property.

Defendants have not produced records that any plowing or salting took place during the three days in question, or any other evidence that would present undisputed facts in support of their motion. Consequently, as Plaintiff correctly states, there is sufficient evidence to create a question of material fact as to whether there was an unreasonable accumulation of snow over the plaintiff's trip and whether this accumulation lasted for an unreasonable period of time (Doc. 72, at 15).

3. *Whether Plaintiff was negligent, and if so, the extent to which this negligence contributed to her slip and fall.*

To impose liability on a defendant in a negligence action, a plaintiff must establish:

the existence of a duty or obligation recognized by law; a failure on the part of the defendant to conform to that duty, or a breach thereof; a causal connection between the defendant's breach and the resulting injury; and actual loss or damage suffered by the complainant.

*Omer v. Mallick*, 527 A.2d 521, 523 (Pa. 1987). However, under Pennsylvania's comparative negligence statute, a plaintiff cannot recover if his or her negligence is "greater than the causal negligence of the defendant or defendants against whom recovery is sought." 42 PA. CONS. STAT. ANN. § 7102 (2011).

Here, the defendants owe the plaintiff a duty of care owed to an invitee. As such, they are liable for physical harm caused to Plaintiff by a condition on the land if they:

> (a) [know] or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> (b) should expect that [invitees] will not discover or realize the danger, or will fail to protect themselves against it, and
> (c) [fail] to exercise reasonable care to protect them against the danger.

RESTATEMENT (SECOND) OF TORTS § 343 (1965).

While the Court has determined that Defendants owed Plaintiff a duty, and Plaintiff has provided evidence of damages in the form of a bi-mal fracture of her ankle, whether the Defendants breached their duty and this breach caused the plaintiff's injuries are questions for a jury. As discussed in (2), *supra*, several factual issues must be resolved in order to determine whether Defendants dealt with the snow and ice in a way that breached their duty to people on the property, and specifically invitees. The weather over the course of Plaintiff's trip; any accumulation of snow on Defendants' property; and the removal, if any, of snow during the three days in question, all play a part in determining whether Defendants had notice of the condition and took reasonable steps to protect Plaintiff, as well as determining whether Plaintiff is responsible, if at all, for her own injuries. In the absence of

10

undisputed facts on these issues, this Court is in no position to determine either party's level

of negligence, or the percentage of fault that can be allocated between the Plaintiff and

Defendants.

4. *Whether the Cacciuttis had a "master-servant" relationship with the Toders and/or Paul*

*Benesz and maintained control over the premises.*

In Pennsylvania, a master-servant relationship gives rise to vicarious liability for

negligence. *I.H. ex re. Litz v. County of Lehigh*, 610 F.3d 797, 801-802 (3d Cir. 2010)

(quoting *Smalich v. Westfall*, 269 A.2d 476, 481 (1970)). Defendants cite to certain

"guideposts" for determining whether such a relationship exists, including:

> Control of manner work is to be done; responsibility for result only; terms of
> agreement between the parties; the nature of the work or occupation; skill
> required for performance; whether one is engaged in a distance occupation or
> business; which party supplied the tools; whether payment is by the time or
> by the job; whether work is part of the regular business of the employer, and
> also the right to terminate the employment at any time.

(Doc. 57, at 12) (citing *Universal Am-Can, Ltd. v. W.C.A.B.*, 762 A.2d 328, 333 (Pa. 2000)).

However, *Universal Am-Can* further explains that "it is the existence of the *right* to control

that is significant, irrespective of whether control is actually exercised." 762 A. 2d at 333

(emphasis in original).

Defendants claim that they cannot be vicariously liable because they were not

engaged in a "master-servant" relationship with any of the co-defendants (Doc. 57, at 11-

13). However, the scope and extent of the Cacciuttis' relationship with SCI Janitorial, the

Toders, and Benesz is unclear. Defendants do not point to any evidence supporting their

11

contention and, drawing all reasonable inferences in favor of Wright, she has offered

sufficient evidence to submit the question to the jury.

It is undisputed that there were no written contracts between the Cacciuttis and any

of the co-defendants. Nonetheless, the Cacciuttis' lease agreement for the property

provides that "snow removal for the driveway and sidewalks will be performed on an as-

needed basis by maintenance staff" (Rental Lease Agreement, Doc. 30, Ex. A), indicating

the presence of a relationship between the Cacciuttis and a snow removal company or

person, or the removal of snow by employees of the Cacciuttis acting within the scope of

their employment as maintenance staff. The Cacciuttis admittedly paid SCI Janitorial to

clean the house and Mr. Toder would also call Benesz when he believed that plowing

needed to be done (Dep. of John Cacciutti, at 36-37; Dep. of Warren Toder, at 48-49). John

Cacciutti's testimony regarding Benesz further places into question the nature of the

defendants' relationship.

> Q: So in terms of the snow removal, the plowing services that you just
> described, could you describe how that works?
>
> A: We contract with someone in the area that does snow plowing. . . . [T]he
> person that we were contracted with lived in the same city and he knew when
> it snowed and he was to come by when it snowed and plow. Now, in the
> meantime, when the tenant moves in, we put in the lease that if they find a
> condition that's unsatisfactory, . . . , they can let us know. We'll call the snow
> plow guy and say come over and plow.
>
> . . . .

Q: Do you know specifically if Scott had [a discussion regarding specific guidance or procedure on the amount of snow needed in terms of plowing] with Mr. Benesz?

A: Yes. Because we – that's, you know, the way we want it done. We prescribe the way we want it done. . .

(Dep. of John Cacciutti, at 39-40, 42-43). Consequently, the possibility of a master-servant relationship between the Cacciuttis and their co-defendants exists and the extent of this relationship constitutes a material question of fact for the jury to determine.

Defendants also contend that Plaintiff has "failed to identify any negligent acts of the co-defendants upon which she can base a claim for vicarious liability" (Doc. 57, at 13). The existence of negligence on the part of co-defendants will be a question of fact for the jury, and therefore cannot be argued as a basis for summary judgment on this Count at the present time.

5. *Whether the lease offered into evidence has been materially altered in any way.*

In the absence of the original writing, other evidence of the writing's contents is admissible if the originals are lost or destroyed and this has not occurred in bad faith. FED. R. EVID. 1004. In such a case, the jury must determine whether the other evidence of content that is offered accurately reflects the content of the original writing. *Id.* at 1008.

There is no dispute that Carter signed a rental agreement for the Cacciuttis' property (Doc. 58, at ¶ 40). However, no party has been able to produce this signed agreement. The only lease agreement on the record is dated April 6, 2011, over two months after Plaintiff's alleged slip and fall. Carter testified that he reviewed his signed lease agreement

13

prior to mailing it, but is unable to confirm whether or not the signed agreement is the same as the April 6, 2011, lease (Dep. of Kurt Carter, at 20). John Cacciutti testified that since 2007, he has modified the lease, although he never speaks directly to any modifications in the indemnity clause (Dep. of John Cacciutti, at 22-24). In the absence of a consensus regarding the terms of the lease, a jury must determine whether the contents of the unexecuted lease accurately reflect those of the lease signed by Carter.

6. *Whether the lease provisions apply to Plaintiff and are sufficiently unambiguous such as to indemnify the Cacciuttis.*

Even assuming that the unexecuted lease offered into evidence is the same as the one signed by Carter, questions remain regarding the extent to which any of the exculpatory provisions indemnify the Defendants, and if so, whether any of the exculpatory provisions is enforceable against Plaintiff. It is undisputed that Wright did not sign the lease and is not listed as a tenant in the unexecuted lease in evidence. Plaintiff also claims that she never saw the lease until it was produced at litigation (Doc. 72, at 23).

An exculpatory clause is valid if (1) the clause does not contravene public policy; (2) the contract is between persons relating entirely to their own private affairs; and (3) each party is a free bargaining agent to the agreement so that the contract is not one of adhesion. *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1189 (Pa. 2010) (citing *Princeton Sportswear Corp. v. H & M Associates*, 507 A.2d 339 (Pa. 1986)). However, a valid exculpatory clause will nevertheless be unenforceable "unless the language of the parties is

clear that a person is being relieved of liability for his own acts of negligence." *Chepkevich*,

2 A.3d at 1189. Contracts against liability for negligence are not favored by law and

therefore established standards must be met before "the exculpatory provision will be

interpreted and construed to relieve a person of liability for his own or his servants' acts of

negligence." *Dilks v. Flohr Chevrolet, Inc.*, 192 A.2d 682, 687 (Pa. 1963). These standards

require that (1) the court strictly construe the contract language; (2) the contract state the

parties' intentions with the greatest particularity and expressed in unequivocal terms; (3) in

cases of ambiguity, the contract must be construed against the party seeking immunity from

liability; and (4) the party invoking the clause's protection has the burden of establishing the

immunity. *Id.*; *Chepkevich*, 2 A.3d at 1189.

Defendants point to exculpatory language in several provisions of the Rental Lease

Agreement as evidence that Plaintiff's claims must be barred. However, the breadth and

scope of the contract, and these provisions, raise questions of fact regarding the validity of

the contract and to whom the lease extends. As Defendants are seeking to invoke the

immunity, the Court must construe any ambiguity against the defendants.

The Cacciuttis first reference Paragraph 8 of the Rental Lease Agreement, entitled

Lessors' Liabilities. This provision states:

> Lessor will not accept liability for death, personal injury, sickness, accident . . .
> or any other loss or misadventure which may occur while staying on
> Premises.   Use of the hot tub is entirely at *Lessee's* risk. *Renter* is also
> aware that this is a high alpine environment, which can result in ice and
> slippery conditions and that the owner is in no way responsible for falls or
> injuries resulting for those falls. (Emphasis added)

15

Here, the words "renter" and "lessee" are not defined anywhere in the lease, and indicate that the while the person on the lease may or may not be held to these provisions, the exculpatory language could be read to not extend to all individuals on the property. Furthermore, the language regarding ice and slippery conditions lacks specificity and is so broad as to raise questions regarding what parts of the property are covered, whether this encompasses the walkway/driveway area and, given the language in the prior sentence, whether the area surrounding the hot tub[4] is the focus of this provision. Additionally, and of great significance, the language of Paragraph 8 is not clear and unambiguous on its face in presenting a statement that the language is intended to, and does, operate to relieve the defendants of liability for their own acts of negligence.

The next paragraph that Defendants point to is (e) of the Rental Lease Agreement, under section (15) entitled "Other." The language states that:

> Lessee agrees to indemnify and save Lessor harmless from all liability, loss or damage arising from any nuisance or harm made or suffered on the leased Premises by the Lessee, tenants, or guests *or* from any carelessness, neglect, or improper conduct of any persons entering, occupying or visiting the lease premises. (Emphasis added).

Similarly to Paragraph 8, here the language is not clear on its face in presenting a statement that the language is intended to, and does, operate to relieve Defendants of liability for their own acts of negligence. Additionally, there are two bases upon which indemnity may be

---

[4] We note that the lease makes clear that the hot tub is on the outside porch (Rental Lease Agreement, at 19) thereby creating another issue of fact as to whether the sentence that follows regarding use of the hot tub in Paragraph 8 should be understood as directed at "ice and slippery conditions" in the proximity of the hot tub.

applicable under this provision. However, both bases raise questions of fact as to whether

the provision is relieving the Cacciuttis of liability for their own, or their servants', acts of

negligence, and are therefore enforceable. The first clause, indemnifying and saving

"Lessor harmless from all liability, loss or damage arising from any nuisance or harm made

or suffered on the leased Premises by the Lessee, tenants, or guests" does not clearly

absolve Lessor from the obligation that he has assumed in section (k) of the Rental

Agreement stating that "snow removal for the driveway and sidewalks will be performed on

an as-needed basis by maintenance staff." Therefore, a jury must determine whether the

lease's language was intended to relieve the Cacciuttis from their acts of negligence.

Additionally, given that it is undisputed that Plaintiff did not sign a lease, and absent

any proof, or even contention, that she was listed as a tenant on the signed lease

agreement, she does not fall into the categories of "lessee" or "tenant" for the purposes of

indemnification.

With respect to the second clause, purporting to indemnify the lessor "from any

carelessness, neglect, or improper conduct of any persons entering, occupying or visiting

the lease premises," there is a question of fact as to whether any party who had an

obligation for snow removal is a person "entering, occupying or visiting the lease premises."

Further, a jury must again determine whether the language in this clause was intended to

relieve the defendants from their acts of negligence.

Defendants also rely on Appendix "A" of the Lease:

17

BY HIS ACT OF OCCUPANCY, TENANT AGREES THAT THE PREMISES
ARE IN GOOD, SOUND AND RELIABLE CONDITION AND THAT IF HE IS
NOT PERSONALLY ACQUAINTED WITH THE CONDITION OF THE
PREMISES THAT HE WILL IMMEDIATELY MAKE AN INSPECTION
THEREOF TO DETERMINE ANY WEAKNESSES THAT MAY RESULT IN
INJURY TO HIM, HIS CO-OCCUPANTS, FAMILY OR GUESTS. IT IS
FURTHER UNDERSTOOD AND AGREED BETWEEN THE PARTIES
HERETO THAT THE TENANT WILL HOLD HARMLESS AND INDEMNIFY
THE LANDLORD FROM ANY AND ALL CLAIMS FOR INJURIES, COSTS
AND DAMAGES AS A RESULT OF THE TENANCY, INCLUDING BUT NOT
LIMITED TO SLIP AND FALL ON ICE AND SNOW, IN, ON AND AROUND
THE HOT TUB DECK AND ENTIRE PROPERTY.

This provision raises several factual issues. First, the provision is arguably placed within

the "Master Bedroom Jacuzzis" section of the Appendix and a jury would have to determine

if the parties to this putative lease intended its applicability to be so limited. Second, as

previously discussed, the language once again may bind the "tenant" but not encompass

the plaintiff. Finally, similarly to Paragraph 8 and section (15), a jury must determine

whether the provision's language indemnifying the landlord and holding him harmless "from

any and all claims for injuries, costs and damages as a result of the tenancy, including but

not limited to slip and fall on ice and snow" was intended to relieve the defendants from their

acts of negligence.

Each of the above provisions cited by Defendants may also fail due to a lack of clear

and unequivocal terms spelling out the parties' intent to grant the immunity herein claimed.

Because the Court finds the contract contains numerous ambiguities, a jury must determine

whether each indemnification provision is stated with sufficient particularity so as to

18

indemnify the defendants, and summary judgment based on indemnification is consequently inappropriate.

## V. Conclusion

For the foregoing reasons, the Court will deny Defendants Cacciuttis' Motion for Summary Judgment (Doc. 56). A separate Order follows.

Robert D. Mariani
United States District Judge